UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| SARAH DAVIS, ADMINISTRATRIX, AD PROSEQUENDUM, et al., | : : : : | HONORABLE JOSEPH E. IRENAS |
|  | : | NO. 02-CV-3659 (JEI) |
| Plaintiffs, | : : | **OPINION** |
|  | : | **(Docket Nos. 206, 209, 214)** |
| v. | : : |  |
| TOWNSHIP OF PAULSBORO, et al., | : : : |  |
| Defendants. | : : |  |

**APPEARANCES:**

MARSHALL L. WILLIAMS
By: Marshall L. Williams, Esq.
1201 Sansom Street
3rd Floor
Philadelphia, PA 19107
        Attorney for Plaintiffs

ROTOLO & MIDLIGE
By: E. Carr Cornog, III, Esq.
2200 Route 31, Suite 12
Lebanon, NJ 08333
        Attorney for Gloucester County Defendants

POWELL, BIRCHMEIER & POWELL
By: James R. Birchmeier, Esq.
1891 State Highway 50
P.O. Box 582
Tuckahoe, NJ 08250-0582
        Attorney for Borough of Paulsboro Defendants

PARKER, MCCAY & CRISCUOLO, P.A.
By: Lisa B. Baughman, Esq.
Three Greentree Centre, Suite 401
Route 73 & Greentree Road
P.O. Box 974
Marlton, NJ 08053
        Attorney for Defendant Underwood Memorial Hospital

BLUMBERG & LINDNER, LLC
By: Charles B. Austermuhl
158 Delaware Street

P.O. Box 68
Woodbury, NJ 08096
          Attorney for Defendants Dr. Arriviello and Emergency
          Physicians Services, LLC

**IRENAS**, Senior District Judge:

      This case arises out of an altercation outside a nightclub,
in which Ernest Davis was struck in the head with a bottle, and
the events that followed.  Five summary judgment motions, all by
various groups of Defendants, are pending.  This opinion
addresses the summary judgment motions of Defendants (1)
Paulsboro Police Officers Suter, Ranton, Kappre, Davis and
Marino; (2) County of Gloucester, Gloucester County Sheriff Gill,
Gloucester County Sheriff Officers Crank, DeMarzio, Galloway, and
Hatton; and (3) Borough of Paulsboro, Borough of Paulsboro Police
Department, and Paulsboro Police Chief Ridinger.[1]

      In their twelve count, 61 page, Fourth Amended Complaint,
Plaintiffs assert against the law enforcement defendants: federal
claims pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988;
and state law claims for false arrest / false imprisonment,
assault and battery, malicious prosecution, abuse of process,
intentional infliction of emotional distress, negligent
infliction of emotional distress, civil conspiracy, negligence,

_____

      [1]  We will refer to the Defendants identified in (1), (2) and (3)
collectively as the "law enforcement defendants."  The remaining two motions
by (4) Underwood Memorial Hospital and (5) Dr. Arriviello and Emergency
Physician Services ((4) and (5) collectively, the "medical defendants") will
be addressed in a separate opinion.

gross negligence, wrongful death, and a survivorship claim.[2]

For the reasons explained below, we will grant summary judgment to the law enforcement defendants.

## I.

In the early morning hours of August 13, 2000, Paulsboro Police Officers Timothy Suter, Leroy Ranton, and Michael Kappre (individually "Officer Suter," "Officer Ranton" and "Officer Kappre") responded to a call from someone at the 1048 Club, a nightclub in Paulsboro.  When Officers Suter and Kappre arrived at approximately 1:55 a.m., they observed an African American man (later identified as Ernest Davis) being placed in the back seat of a car.  Officer Suter observed that Davis was "covered in blood," with blood on his face and head, and blood coming from his right ear.  (Pls. Ex. 23.1)  The car drove away with Davis in it.

All three officers cleared the scene and began their investigation.  They learned that Davis had been hit over the head with a glass bottle.  Officer Suter observed drops of blood on the sidewalk and street as well as a small pool of blood close to where the car had been.  (Id.)  He also saw blood spattered on the wall next to the club entrance and broken pieces of a glass beer bottle at the base of the wall.  (Id.)

_____

[2]  We have subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

3

At approximately 2:30 a.m., the three officers, each in their own cars, were dispatched to 27 West Buck Street in response to a complaint of an African American man banging at the door.  Upon arriving at 27 West Buck Street, Officer Ranton learned from the woman complainant who lived there that an African American man with blood on his shirt had been banging on her door.  Officer Ranton radioed the information to the other officers.  Officers Ranton and Kappre began to search the area when Officer Suter advised them that he heard yelling nearby on West Washington Street and was going there to investigate.

Officer Suter arrived alone at 19 West Washington Street where he saw at least five people outside in front of the house. (Pls. Ex. 32 at pp. 36-37)  From his patrol car he observed Davis standing in the doorway of the house[3] with blood on his shirt, "yelling and screaming" at the women who were there, one of whom was Davis' girlfriend, Lashana Carlson.  (Pls. Ex. 23.1)  Officer Suter immediately exited his car, at which point Davis walked out to the curb directly towards Officer Suter, pushing past the women.  (Pls. Exs. 23.1 and 32 at p. 44)

Officer Suter could see that Davis was still bleeding from his head, and asked Davis what had happened and if he needed an ambulance.  (Pls. Exs. 23.1 and 32 at p. 45)  Davis responded "antagonistically," yelling that "nothing was going on" and

---

[3]   The front door of the house is approximately 15 to 20 feet from the street curb.  (See Pls. Exs. 28.3 and 32 at p. 42)

4

Officer Suter should "mind [his] own fucking business."  (Pls.
Ex. 23.1 and 32 at p. 49)  Officer Suter continued his attempts
to investigate how Davis had been injured and what the current
disturbance was about, but Davis refused to cooperate, repeatedly
yelling that he was going to "fuck somebody up."  (Id.)

While Officer Suter and Davis were standing on the sidewalk,
Davis shoved Officer Suter with both hands in an attempt to make
his way back towards the front door.  (Pls. Ex. 32 at p. 49)
Officer Suter noticed that Davis' eyes were bulging and
bloodshot. (Id. at p. 49; see also Pls. Ex. 23.1)  After pushing
past Officer Suter, Davis pushed Lashana Carlson and another
woman out of the way.  (Pls. Ex. 23.1)  Officer Suter followed
after him.

At this point Officer Ranton arrived at the scene.  He
observed the group of people outside the house at 19 West
Washington Street and saw Davis and Officer Suter at the front
door.  (Pls. Ex. 23.3)  Davis pushed Officer Suter again and
unsuccessfully attempted to shut the front door on Officer Suter.
(Pls. Exs. 23.1, 23.3, and 32 at pp. 46, 51)  Officer Suter then
entered the house and followed Davis into the kitchen.
Immediately after watching Officer Suter and Davis enter the
house, Officer Ranton also went into the house.

Officer Kappre was the last to arrive.[4]  He was aware that

---

[4]  The record does not allow a specific determination of the time
Officer Kappre arrived at 19 West Washington Street.  We infer that all three
officers arrived within several minutes of each other.

Officer Suter had gone to the address but did not see him
outside.  He heard screaming coming from inside the house and
went in.  He found both Officer Suter and Officer Ranton
struggling to subdue Davis on the kitchen floor.  (Pls. Ex. 23.0)

     Once Officer Suter and Davis reached the kitchen, Davis
began banging on the walls and continued to yell.  (Pls. Exs.
23.1 and 32 at p. 55-56)  Officer Suter again asked Davis what
happened to him. (Pls. Exs. 23.1 and 32 at p. 53, 55-56)  Davis
shoved Officer Suter while yelling "get the fuck out of here. You
aint [sic] allowed in here."  (Id.)  Officer Suter then told
Davis he was under arrest.  (Id.)  Swinging his arms, Davis
yelled "I aint [sic] going nowhere.  Get the fuck off me."  (Id.)
Then Officer Suter sprayed Davis in the face with pepper spray.
(Pls. Exs. 23.1 and 32 at p. 57)  As Officer Suter did so, Davis
poked Officer Suter in the eye.[5]  (Id.)  Davis put his hands up
to his face and bent over in reaction to the spray.  (Id.)
Officer Suter "wrestled" Davis to the ground, face down.  (Pls.
Ex. 23.1)

     Officer Ranton arrived in the kitchen at this time.  (Id.;
Pls. Ex. 23.3)  Davis was "squirming" on the floor, resisting
Officer Suter's attempts to handcuff him by placing his hands
under his body.  (Pls. Exs. 23.1, 23.3, 32 at p. 57-58, 38 at p.
64-65)  Officer Ranton came to Officer Suter's assistance and

---

     [5]  We draw the reasonable inference that Davis did not intentionally
poke Officer Suter in the eye.

through their combined efforts, they were able to get one
handcuff on Davis.[6]   (Id.)  Davis was still yelling and kicking
his legs so both officers "sat" on Davis "to keep him from
kicking."[7]  (Id.)

Officer Kappre arrived in the kitchen at this time and
immediately helped the two other officers place the second
handcuff on Davis so that Davis' arms were held behind his back.
(Pls. Ex. 23.1, 23.3)  Davis continued yelling profanities after
he was handcuffed, complaining several times that the pepper
spray was bothering him and that the handcuffs were too tight.
(Id.)  After "several minutes" one of the officers helped him to
sit up as he continued to yell "get the fuck off me." (Id.)
Because Davis continued to complain that the handcuffs were
hurting him, Officer Ranton attempted to loosen them.[8]  (Id.)
Officers Suter and Kappre then lifted Davis off the floor and
carried him to Officer Suter's patrol car.  (Pls. Ex. 23.0)

At the patrol car Davis was still uncooperative, refusing to
get into the car.  (Pls. Exs. 23.0, 23.1, 23.3)  Because Davis
was not cooperating with them, the officers allowed Lashana
Carlson and Artese Ruffin to place Davis in the back of the

---

[6]  Paulsboro Police records indicate that Davis was 27 years old, six
feet, two inches tall, and 205 pounds on the night of his arrest.  (Suter Ex.
G) The record does not indicate the size of the officers.

[7]  It is not clear on what part of Davis' body the officers sat.

[8]  Officer Ranton's report and Officer Suter's report conflict on
whether the handcuffs were actually loosened.  Accordingly, we assume for
purposes of this motion that the handcuffs were never successfully loosened.

7

patrol car.  (Id.)  Carlson and Ruffin talked to Davis while placing him in the car, in an attempt to calm him down.  (Id.)

Officer Suter transported Davis to police headquarters where they were met by Carlson and Officer Kappre.  (Pls. Exs. 23.0 and 23.1)  The officers and Carlson anticipated that they would meet an ambulance at police headquarters.  (Id.)  Upon arriving at headquarters, Carlson met the officers and talked to Davis, attempting to calm him while the officers removed him from the car.  (Id.)  Davis was still bothered by the pepper spray and the handcuffs.  (Id.)  Officer Suter helped Davis steady himself as he exited the car.  (Id.)  The two officers then escorted Davis to a holding cell while Carlson went to the lobby to wait for the ambulance.  (Id.)  Once in the holding cell, Davis flushed his face at the water fountain to relieve the effects of the pepper spray.[9]  (Pls. Ex. 23.1)  Davis stayed in the holding cell for approximately five minutes before the ambulance arrived.  (Id.)

Officers Suter and Kappre escorted Davis to the ambulance and placed him inside.  (Pls. Ex. 23.0 and 23.1)  Carlson was present but did not ride in the ambulance.  (Id.)  The ambulance records indicate that Davis was "very argumentative" and the ambulance personnel were unable to obtain vital signs or medical history from him.  (Pls. Ex. 3)  Officer Kappre rode in the

---

[9]  We infer that the handcuffs were removed once Davis entered the holding cell because Officer Kappre's report indicates that he handcuffed Davis when Davis later left the holding cell to be placed in the ambulance. (Pls. Ex. 23.0)

ambulance with Davis to Underwood Memorial Hospital ("UMH").

The ambulance arrived at the UMH Emergency Room at 3:06 a.m. Dr. Arriviello examined Davis at approximately 3:30 a.m. (Pls. Ex. 4) Determining that Davis was "fit for incarceration," Dr. Arriviello discharged him from the Emergency Department.[10] (Pls. Ex. 5) The discharge instructions directed that Davis take 600 milligrams of Advil every 6 hours and apply an ice pack to "the affected area" every 2-3 hours for the next 48 hours. (Id.)

Officer Ranton picked up Davis and Officer Kappre at UMH to transport them back to Paulsboro police headquarters. Davis was placed in a holding cell at 4:08 a.m. (Pls. Ex. 6) Officer Kappre observed that Davis appeared to fall asleep immediately. (Pls. Ex. 23.0) The Paulsboro Police Cell Block Prisoner Log indicates that officers checked on Davis at 5:50 a.m. and 6:20 a.m. (Pls. Ex. 6) Both times Davis appeared to be sleeping. (Id.) Officer Kappre at one time observed Davis vomiting on the cell floor. (Pls. Ex. 23.0) When Officer Kappre told Davis he should vomit in the toilet Davis responded "O.K." (Id.)

Because Davis could not post bail, he was transferred to the Gloucester County Sheriff's Department for holding in the county jail. Accordingly, at approximately 7:12 a.m.[11] Gloucester

---

[10] Plaintiffs challenge the adequacy of Dr. Arriviello's examination. The facts relevant to the claims against Dr. Arriviello will be discussed in a separate opinion.

[11] We note that all of the other documents submitted in connection with the present motions indicate that the Gloucester County Sheriff's Officers picked-up and transported Davis at approximately 6:55 a.m. (See Pls. Exs. 6,

County Sheriff's Officer Kimberly Reichert[12] arrived at Paulsboro Police headquarters to transport Davis to the county jail. (Pls. Ex. 17.) Officer Reichert, along with Paulsboro Officers Vernon Marino and Bernard Davis, effected the transfer.[13]

Officer Marino opened the holding cell but remained outside looking in on Davis. (Pls. Ex. 27) Davis was sitting on the cell bench, hunched over with his head in his hands. (Id.) He did not respond at all when the cell door opened. (Id.) Officer Marino then stepped into the cell, and while standing approximately two feet away from Davis, stuck out his foot to nudge Davis in the lower left leg.[14] (Id.) Officer Marino testified that he "nudged" Davis to get his attention and reported that he did this with his shoe because he was not wearing protective latex gloves and Davis was covered in blood.

---

17.1, 17.2, 23.2) However, Officer Reichert's report indicates that the time was 7:12 a.m. (Pls. Ex. 17.0) Since this is the time Plaintiffs assert is correct, for the purposes of this motion we will assume 7:12 a.m. is accurate.

[12]  Officer Reichert is not named as a Defendant to this suit.

[13]  Plaintiffs have submitted a videotape of Davis' removal from the holding cell. (Pls. Ex. 27) The tape shows a third male officer present during the removal but he is unidentified by the parties. In any event, we note that this unknown third officer did not participate in the actual removal of Davis from the cell.

[14]  Plaintiffs' counsel strenuously asserts that Officer Marino "kicked" Davis. After carefully and repeatedly viewing the videotape of Davis' removal, the Court is confident that Officer Marino's actions cannot be characterized as a "kick" by any stretch of the imagination. Additionally, Plaintiffs' counsel asserts that Officer Reichert "observed and assisted Officer Marino who kicked Davis on camera." (Pls. Br. at 27) At no point on the videotape is Officer Reichert shown making any physical contact with Davis. Indeed, the videotape and Officer Reichert's testimony establish that she left the holding cell area before Davis was actually removed. Plaintiffs' erroneous factual assertions are expressly refuted by their own evidence and exceed the bounds of zealous advocacy.

(Pls. Ex. 23.2 and 37 at p. 37-39)  When Davis did not respond, Officer Marino stepped out of the cell.

Officer Reichert then slid Davis' boots into the cell, placing them a few inches away from his feet.  (Pls. Ex. 27) Davis again was not responsive after Officer Marino told him several times to put his boots on.  (Pls. Ex. 37 at p. 36-37) Officer Marino stepped into the cell to nudge Davis but Davis continued sitting on the bench with his head in his hands.  (Pls. Ex. 27)  Officer Marino nudged Davis twice more to no avail. (Id.)  At that time Officer Marino obtained latex gloves and stepped into the cell.  (Id.)  He grabbed Davis' left wrist with his left hand and grabbed under Davis' armpit with his right hand.  (Id.)  In a smooth motion, he pulled Davis from the bench in the direction of the cell door.  (Id.)  Davis fell to his knees and placed his right hand on the floor while Officer Marino held Davis' left arm.  (Id.)  Davis was not responding.  (Id.) Officer Marino continued to pull Davis out of the cell by his left arm.  (Id.)  Davis did not actively resist Officer Marino but he did not attempt to cooperate with the officer either. (Id.)

While on the floor, Officer Marino pulled Davis a few feet until Davis was just outside the cell door in the hallway.  (Id.) Davis was on his back at this time but rolled onto his stomach.[15]

---

[15]   It is unclear from the videotape whether Davis rolled onto his stomach himself or whether Officer Marino rolled him over.

(Id.)  Officer Marino stood over Davis, straddling him.  (Id.)
He placed handcuffs on Davis.[16]  Then with some assistance, Davis
stood up by his own volition and walked down the hall with
Officer Marino and another officer holding his arms.  (Id.)
Davis was escorted into Officer Reichert's car.  (Pls. Ex. 17.0)
Davis was conscious at that time.  (Pls. Ex. 37 at p. 47)

    The trip to the Gloucester County jail lasted approximately
ten minutes. (Pls. Ex. 17.0)  Davis was assisted into the booking
area where Officer Reichert gave the booking officers Davis'  fit
for incarceration slip.  (Id.)  Davis was booked at approximately
7:40 a.m. (Pls. Ex. 17.3)

    Upon Davis' arrival at the Gloucester County Jail, Sergeant
Robert DeMarzio observed, "Davis look [sic] intoxicated[17] and he
was snoring upon arrival and had to be carried in by assisting
officers."[18]  (Gloucester Ex. W)  Because of Davis' condition, he
was placed in a holding cell and Medic Walker was called to
attend to him.  (Id., see also Gloucester Ex. V at p. 33-36)
Sergeant DeMarzio ordered an officer to stay with Davis until the

---

    [16]  The actual handcuffing is not visible on the video tape because the
cell door blocked the camera's view.  Officer Marino's report states that
Davis attempted to place his arms underneath his body and that Officer Davis
assisted Officer Marino in securing the handcuffs.  (Pls. Ex. 23.2)

    [17]  Sergeant DeMarzio testified that Davis "smelled of alcohol" and did
not respond to questions.  (Gloucester Ex. V at p. 18, 22) Defendant Officers
Hatton and Galloway also testified that they smelled alcohol on Davis.
(Gloucester Exs. T at p. 51; U at p. 74)

    [18]  Defendants Justin Hatton and Brian Galloway carried Davis into the
booking area.  (Gloucester Ex. T at p. 31) Defendant Lieutenant Crank was also
present during the booking process but his specific involvement in the events
is unclear from the record.  (Gloucester Ex. U at p. 35)

medic arrived.  (Gloucester Ex. V at p. 47) The parties do not
dispute that Medic Walker[19] found Davis face down on the cell
floor with blood "oozing" from his right ear, nose and scalp and
that Davis was unresponsive to Walker's various attempts to rouse
Davis.  (Pls. Ex. 17.4)  Medic Walker advised Defendant
Lieutenant William Crank to call an ambulance.  (Pls. Ex. 17.3,
17.4)  The entries in the Gloucester County Sheriff's
Lieutenant's Log Book recount the timing of these events:

> 7:40 [a.m.] (2) Booked inmate Ernest C. Davis.  He
> had medical clearance from Paulsboro P.D. and U.M.H.
>
> 8:15 [a.m.] (3) Had Medic Jim Walker check above
> inmate and read medical clearance sheet.
>
> 8:30 [a.m.] (4) Medic Walker asked me to call a
> [sic] ambulance and R/P to transport inmate Davis to
> U.M.H.
>
> 8:43 [a.m.] (5) Ambulance and R/P arrived at
> [Gloucester County Jail]
>
> 9:00 [a.m.] (6) Informed by EMT's [sic] that they
> are transporting the above inmate to Cooper Hospital
> in Camden

(Pls. Ex. 17.3)

After being admitted to Cooper Hospital, Davis underwent
several surgeries, including brain surgery for a subdural
hematoma and a subarachnoid hemorrhage.  He spent several months
at Cooper Hospital, including over two months in intensive care.
On November 21, 2000, Davis was transferred out of Cooper

---

[19]  Medic Walker was named a defendant to the Third Amended Complaint,
but he was dropped as a defendant to the Fourth Amended Complaint.

Hospital into rehabilitative care.

Davis died on October 15, 2004.  His death certificate lists the causes of death as "acute myelogenous leukemia," "ureteral obstruction- bilateral," and "acute renal failure."  (Pls. Ex. 9)

Plaintiffs, the parents of Ernest Davis, bring this suit on their son's behalf.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  "'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'- that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'"  *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*).   The role of the Court is not "to weigh the

14

evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### III.

Count One of the Complaint asserts claims pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988.[20]  Plaintiffs' core claims, based on the allegations of the Fourth Amended Complaint and Plaintiffs' Opposition, appear to be the § 1983 claims. Therefore, we will address the § 1983 claims after addressing the other statutory claims.

### A.

Though not clearly articulated, Plaintiffs apparently assert that the defendant law enforcement officers' actions were motivated by racial animus, thereby violating §§ 1981 and 1985.[21]

---

[20]  Section 1988 does not itself create any substantive right or cause of action, *Moor v. County of Alameda*, 411 U.S. 693, 703 (1973), rather it operates to make available to Plaintiffs a method of enforcing the Defendants' liability for actions taken against the now deceased Ernest Davis.  *See Pennsylvania v. Porter,* 659 F.2d 306, 318 (3d Cir. 1981).  Additionally, because we will grant summary judgment on the other federal civil rights claims, the attorneys' fees provisions contained in this section need not be addressed.

[21]  Section 1981 states, "Equal rights under the law. (a) Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."
Section 1985(3) provides for civil liability for conspiracies to

To establish a violation of either § 1981 or § 1985 Plaintiffs must put forth evidence of racial discrimination. *See Pryor v. NCAA,* 288 F.3d 548, 569 (3d Cir. 2002) ("To establish a right to relief under § 1981, a plaintiff must show (1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981")(internal quotations omitted); *Bougher v. Univ. of Pitt.*, 882 F.2d 74, 79 (3d Cir. 1989) (Section 1985(3) claim requires a showing that defendants were "motivated by a class-based invidiously discriminatory animus," and that they "conspired to deprive plaintiff of the equal protection rights of the laws or of equal privileges and immunities under the laws.")

Viewing the evidence in the light most favorable to Plaintiffs, and drawing all inferences in their favor, we find no facts and can draw no inferences to support a finding that any of the Defendants acted with racial animus or intended to discriminate against Davis on the basis of race. The record is

---

interfere with civil rights, stating "[i]f two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

completely devoid of any evidence in this regard.  Accordingly,
summary judgment will be granted on the §§ 1981 and 1985
claims.[22]

Furthermore, because we grant summary judgment as to the
§ 1985 claims, we must also grant summary judgment as to the
§ 1986 claims.  *See Clark v. Clabaugh*, 20 F.3d 1290, 1295 n.5 (3d
Cir. 1994) ("In order to maintain a cause of action under § 1986,
the plaintiffs must show the existence of a § 1985 conspiracy.
Any issue of material fact in a § 1986 action presupposes and
relates to a § 1985 conspiracy.  Thus, if the elements of the
§ 1985 conspiracy are missing, a § 1986 cause of action is
properly dismissed on summary judgment.")

B.

Plaintiffs assert a plethora of constitutional violations
via their § 1983 claims.  The Fourth Amended Complaint asserts
against all Defendants violations of Davis' First, Fourth, Fifth,
Sixth, Eighth, Thirteenth and Fourteenth Amendment rights under a
variety of theories.

---

[22]  See *Joseph v. Allegheny County Airport Auth.,* 152 Fed. Appx. 121,
124-25 (3d Cir. 2005) ("the District Court properly granted summary judgment
with regard to Joseph's conspiracy claim under 42 U.S.C. § 1985.  Indeed,
Joseph failed to allege or submit any evidence of a conspiracy or race-based
animus."); *Perry v. Gold & Laine, P.C.*, 371 F. Supp. 2d 622, 629 (D.N.J. 2005)
("there is nothing in the record to suggest that Defendants engaged in or
intended to engage in any racially-motivated discrimination against Plaintiff.
Moreover, Plaintiff makes no allegations regarding any contracts to which she
is a party. Therefore, Plaintiff's claims . . . pursuant to 42 U.S.C. § 1981
are dismissed.")

Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.

We begin by addressing the individual liability of the defendant law enforcement officers and then turn to the remaining issues of municipal liability.

(1)

Summary judgment will be granted on the Thirteenth Amendment claims as Plaintiffs do not allege or prove any facts to support a conclusion that Davis was subjected to slavery or involuntary servitude.  The Third Circuit has interpreted "involuntary servitude" as encompassing "forced labor through physical coercion."  *Steirer v. Bethlehem Area Sch. Dist.*, 987 F.2d 989, 998 (3d Cir. 1993) (abrogated on other grounds by *Troster v. Pennsylvania State Dep't Corrs.*, 65 F.3d 1086, 1090 (3d Cir. 1995)).  The Fourth Amended Complaint does not allege, and the record does not support a conclusion that Davis was forced,

18

through physical force or otherwise, to do any labor.  *See Johnson v. Anhorn*, 334 F. Supp. 2d 802, 806-07 (E.D. Pa. 2004) ("Because plaintiffs have failed to allege any conduct that could arguably be interpreted as involuntary servitude, their § 1983 claims under the Thirteenth Amendment must be dismissed.").[23]

(2)

Likewise, Plaintiffs' § 1983 claims based on the Sixth Amendment must be dismissed for failure to establish a constitutional violation.  First, we note that Plaintiffs do not articulate any theory under which the facts alleged support a Sixth Amendment violation.  Instead, Plaintiffs' Fourth Amended Complaint merely includes the Sixth Amendment in its list of seven constitutional amendments that assertedly underlie the § 1983 claims.  Given the facts of this case, we presume that Plaintiffs allege that Defendants somehow denied Davis his Sixth Amendment right to counsel.  However, even under this liberal reading of the Fourth Amended Complaint, summary judgment is warranted.

The Sixth Amendment right to counsel attaches at the initiation of formal charges.  *Massiah v. United States*, 377 U.S. 201 (1964).  Thus, any potential violation of Davis' Sixth

---

[23]  Alternatively, we dismiss the § 1983 / Thirteenth Amendment claims against all the individual Paulsboro Police Officers because Plaintiffs have withdrawn their claim against these Defendants.

Amendment rights must have occurred after criminal charges were formally initiated against him.  However, it is not clear from the record that Davis was ever arraigned.  Indeed, given that Davis slipped into a two month-long coma after his arrival at Cooper Hospital on August 13, 2003, we think it unlikely that Davis was ever arraigned.

In any event, Plaintiffs have failed to carry their burden of putting forth any facts in support of their Sixth Amendment claim.  Therefore summary judgment will be granted.[24]

### (3)

We must also dismiss Plaintiffs' Fifth Amendment claims. Like the previously discussed claims, Plaintiffs' theory of liability and argument in opposition to summary judgment on this claim is non-existent.  The Court is left to speculate why Plaintiffs assert that Davis' Fifth Amendment rights were violated.  Even if we were to liberally read the Fourth Amended Complaint as somehow asserting that the law enforcement Defendants denied Davis his Fifth Amendment right to counsel or infringed his right to be free from compelled self-incrimination,[25] summary judgment would still be warranted.

---

[24]  Alternatively, we dismiss the § 1983 / Sixth Amendment claims against all the individual Paulsboro Police Officers because Plaintiffs have withdrawn their claim against these Defendants.

[25]  We note that there is a serious question whether Plaintiffs have actually asserted such claims.  None of the papers submitted by Plaintiffs include words such as "self-incrimination," "*Miranda,*" or even "right to

The Third Circuit has stated, "a plaintiff may not base a
§ 1983 claim on the mere fact that the police questioned the
plaintiff in custody without providing *Miranda* warnings where
there is no claim that the statements obtained in violation of
*Miranda* were used against the plaintiff."  *Renda v. King*, 347
F.3d 550, 557 (3d Cir. 2003).  While there is no evidence in the
record that any law enforcement officer read Davis his rights at
any time (either at the time of his arrest or before subsequent
questioning), there is also no evidence that any of Davis'
statements to the police were ever used against him.  Indeed,
Davis was never charged in connection with the nightclub incident
and there is no evidence in the record regarding the disposition
of the charges arising out of the incident at 19 West Washington
Street.

Likewise, assuming Davis was "interrogated" in the Fifth
Amendment sense, he nevertheless had "no free-standing Fifth
Amendment claim for denial of counsel during his interrogation."
*James v. York County Police Dep't*, No. 05-2852, 2005 U.S. App.
LEXIS 26876 at *15 (3d Cir. Dec. 8, 2005).  "[V]iolations of the
prophylactic *Miranda* procedures do not amount to violations of
the Constitution itself. . . . the 'right to counsel' during
custodial interrogation recognized in [*Miranda*] is merely a
procedural safeguard, and not a substantive right."  *Giuffre v.*

counsel."  The Fourth Amended Complaint includes nothing more than conclusory
statements that Davis' Fifth Amendment rights were violated.

21

*Bissell*, 31 F.3d 1241, 1256 (3d Cir. 1994).  Summary judgment will be granted on the Fifth Amendment § 1983 claims.[26]

(4)

Plaintiffs next assert that Davis' First Amendment rights were violated.  Specifically, Plaintiffs contend that Officer Suter retaliated against Davis by "attempt[ing] to silence Davis' exercise of his free speech right in his own residence with threats of arrest."  (Pl. Br. at 20)  Plaintiffs describe the speech at issue as "criticisms . . . curse words, tasteless epithets, and . . . displays of contempt for law enforcement officers."  (Pls. Br. at 20)

The record demonstrates that Davis was screaming, yelling, cursing, and acting aggressively when Officer Suter first arrived at 19 West Washington Street. (Pls. Ex. 23.1)  When Officer Suter attempted to ask Davis questions about how he got hurt and what was currently going on at this location, Davis acted "antagonistic" with his "eyes bulging" and yelled that "he was going to fuck somebody up."  (Id.)  Notably, the record demonstrates that Davis was acting in this manner--"ranting and raving"-- towards everyone at the scene, including Lashana Carlson, his girlfriend.  (See Id.) ("All persons present

---

[26]  Alternatively, we dismiss these claims against all the individual Paulsboro Police Officers because Plaintiffs have withdrawn their claim against these Defendants.

recoiled in fear at [Davis'] actions as if they were afraid of him."))

We find no First Amendment violation based on these facts. First Amendment protection does not extend to "the lewd and obscene, the profane, the libelous, and the insulting or fighting words." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). Viewing the statements in the light most favorable to Plaintiffs, we must conclude that the statements, taken in context, were nothing more than profane words which "tend[ed] to incite an immediate breach of the peace." *Chaplinsky*, 315 U.S. at 571-72; *see also Texas v. Johnson*, 491 U.S. 397, 409 (1989) ("To be punishable, words must do more than bother the listener; they must be nothing less than an invitation to exchange fisticuffs."). Davis, standing near the street curb outside 19 West Washington Street at approximately 2:30 a.m., repeatedly "yelled" at the several people standing by that we has going to "fuck somebody up."  The only reasonable interpretation of such statements is that they tend to incite a physical confrontation.[27]

Assuming alternatively that some of Davis' speech fell outside the realm of fighting words and was therefore protected,

_____

[27]  Davis was arrested and charged with disorderly conduct.  Thus, Plaintiffs' First Amendment claims are at least to some extent a back-door attack on the constitutionality of New Jersey's disorderly conduct statute, N.J. Stat. § 2C:33-2.  We note, however, that the New Jersey Supreme Court has upheld the constitutionality of the statute. *See State v. Brown*, 62 N.J. 588, 591 (1973) (relying on *Chaplinsky*).

Plaintiffs have not established the requisite causal connection between Davis' speech and the alleged retaliation. *See Estate of Smith v. Marasco,* 318 F.3d 497, 512 (3d Cir. 2003) (First Amendment retaliation claims require a showing that (1) the plaintiff "engaged in protected activity;" (2) "the government responded with retaliation;" and (3) "the protected activity was the cause of the retaliation."). The undisputed facts establish that Officer Suter arrested Davis for his violent behavior, not his speech. Officer Suter's report states:

> [Davis] acting in a loud and violent manner, pushed
> past me and entered into #19 Washington. As he
> entered he pushed Lashanna out of the way and
> Christine Ruffin. I tried to follow still
> conducting my investigation. At this time [Davis]
> shoved me back and tried to shut the door in my
> face. I entered #19 advising [Davis] that he was
> going to be arrested for disorderly conduct and
> obstruction if he continued. . . . Davis again
> shoved me back. Stating get the fuck out of here.
> Get the fuck off of me you aint allowed in here. As
> he did so, I advised [Davis] he was under arrest.

(Pls. Ex. 23.1 at 9) As a result of these actions, Davis was later charged with resisting arrest and offensive touching of Officer Suter in addition to disorderly conduct. Accordingly, summary judgment on the First Amendment claims is warranted.

(5)

We finally turn to the core of Plaintiffs' § 1983 claims. Plaintiffs assert that Davis was: (i) arrested without probable

cause, (ii) subjected to excessive force during and after his arrest, and (iii) denied or delayed medical treatment for his injuries in violation of the Fourth, Eighth, and Fourteenth Amendments.[28]

Probable cause and exigent circumstances

Plaintiffs complain that Officer Suter entered Davis' residence at 19 West Washington Avenue and arrested him without a warrant and without probable cause.[29]  The undisputed factual record demonstrates that Officer Suter had probable cause to arrest Davis for disorderly conduct, resisting arrest, and offensive touching of Officer Suter.  Officer Suter personally observed and was the victim of Davis' conduct.  Thus, a prudent person would have sufficient reason to believe that Davis had committed an offense.  *See Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (probable cause is "defined in terms of facts and circumstances sufficient to warrant a prudent man in believing

---

[28]  Because Davis was never convicted of the crimes with which he was charged, he fails to state a claim for violation of his Eighth Amendment right to be free from cruel and unusual punishment.  *See Fuentes v. Wagner*, 206 F.3d 335, 344 n.11 (3d Cir. 2000) (Cruel and unusual punishment clause "do[es] not apply until 'after conviction and sentence.'") (quoting *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989)).  Accordingly, we will analyze these claims pursuant to the Fourth and Fourteenth Amendments.

[29]  We note that there is some question whether Davis actually lived at 19 West Washington Street.  Several of the documents in the record seemingly indicate that Davis lived at 117 North 21st Street in Camden, New Jersey, on August 13, 2000 (see e.g. Pls. Exs. 4, 17 & 19), while others list his address on that date as 19 West Washington Street in Paulsboro, New Jersey.  (See e.g. Pls. Ex. 18).  For the purposes of this motion only we will resolve this factual dispute in favor of Plaintiffs and proceed under the assumption that Davis did indeed live at 19 West Washington Street on August 13, 2000.

that the suspect has committed or was committing an offense.")
(internal quotations omitted).

However, it is undisputed that the Paulsoboro police did not
have a warrant for Davis' arrest when Davis was arrested in the
kitchen of 19 West Washington Street.  Thus the issue is whether
Davis' Fourth Amendment right to be free from an unreasonable
seizure was violated by a warrantless arrest in his home when
that arrest was supported by probable cause, and if there was a
constitutional violation, is Officer Suter nevertheless entitled
to qualified immunity?

"[T]he Fourth Amendment has drawn a firm line at the
entrance to house.  Absent exigent circumstances, that threshold
may not reasonably be crossed without a warrant."  *Payton v. New
York*, 445 U.S. 573, 590 (1980); *see also Welsh v. Wisconsin*, 466
U.S. 740, 749 (1984) ("warrantless felony arrests in the home are
prohibited by the Fourth Amendment, absent probable cause and
exigent circumstances").[30]  Exigent circumstances include "hot
pursuit of a fleeing felon, or imminent destruction of evidence,

---

[30]   There is no evidence in the record that Officer Suter had Carlson's
consent to enter the house.  In any event, Officer Suter surely did not have
Davis' consent.  On the issue of consent, the Supreme Court's most recent
discussion of warrantless entries into the home is quite apropos to this case:
"it is fair to say that a caller standing at the door of a shared premises
would have no confidence that one occupant's invitation was a sufficiently
good reason to enter when a fellow tenant stood there saying 'stay out.' . . .
Since the co-tenant wishing to open the door to a third party has no
recognized authority in law or social practice to prevail over a present and
objecting co-tenant, his disputed invitation, without more, gives a police
officer no better claim to reasonableness in entering than the officer would
have in the absence of any consent at all."  *Georgia v. Randolph*, 547 U.S.
___, 2006 WL 707380 at *7-8 (March 22, 2006).  Officer Suter was quite
literally standing at the door of 19 West Washington Street and Davis was
unequivocally yelling "stay out."

. . . or the need to prevent a suspect's escape, or the risk of danger to the police or to the other persons inside or outside the dwelling." *Minnesota v. Olson*, 495 U.S. 91, 100 (1990).  The burden of establishing exigent circumstances lies with the government.  *Welsh*, 466 U.S. at 750; *Sharrar v. Felsing*, 128 F.3d 810, 820 (3d Cir. 1997).

We hold that exigent circumstances existed.  The undisputed record establishes that when Officer Suter arrived at 19 West Washington Street, a crowd had already developed outside the house and Davis was creating a disturbance.  Indeed, Officer Suter was drawn to the house in the first place because he heard yelling.  He knew that Davis had been involved in a fight earlier that night and that Davis had already attempted to gain entry into a house that was not his, prompting the woman inside the house to call the police.

Upon seeing Officer Suter arrive, Davis "pushed and shoved past" Lashana Carlson, who lived at 19 West Washington Street, and aggressively pushed through the crowd of people outside the house.  Those people demonstrated concern about Davis' belligerent behavior.  (See Pls. Ex. 23.1 at 8-9)  Then Davis shoved Officer Suter.[31]  Accordingly, we hold that a significant

---

[31]   Under New Jersey criminal law, one who shoves a police officer is guilty of an aggravated assault in the fourth degree.  N.J. Stat. § 2C:12-1 (b)(5)(A).  *Cf. Welsh*, 466 U.S. at 570 ("Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries. . . . When the government's interest is only to arrest for a minor offense, that presumption is difficult to rebut.")

risk of danger to the police and to the other persons inside or outside the dwelling existed and the warrantless entry was reasonable.[32]

Alternatively, assuming *arguendo* that exigent circumstances did not exist, Officer Suter is entitled to qualified immunity. A law enforcement officer is entitled to qualified immunity if it would not be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Gilles v. Davis,* 427 F.3d 197, 203-04 (3d Cir. 2005). "Thus, law enforcement officials who reasonably but mistakenly conclude that their conduct comports with the requirements of the Fourth Amendment are entitled to immunity.  In this way, the qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Sharrar*, 128 F.3d at 826 (quoting *Hunter v. Bryant*, 502 U.S. 224 (1991)); *see also Gilles*, 427 F.3d at 207 ("Qualified immunity encompasses mistaken judgments that are not plainly incompetent.  Under qualified immunity, police officers are entitled to a certain amount of deference for decisions they make in the field.  They must make 'split-second judgments -- in

---

[32]   It is important to note that this case presents only a warrantless entry and not an attendant search.  *See Randolph*, 547 U.S. at ___, 2006 WL 707380 at *9 (drawing a distinction between "when the police may enter without committing a trespass and when the police may enter to search for evidence" and observing "the question whether the police might lawfully enter over objection in order to provide any protection that might be reasonable is easily answered yes.").

circumstances that are tense, uncertain, and rapidly evolving.'")(quoting *Saucier v. Katz*, 533 U.S. 194, 204-05 (2001)).  Applying this standard[33] we must conclude that in the situation confronting Officer Suter, it would not be clear to a reasonable officer that his conduct was unlawful.

As noted above, there was a legitimate risk to the safety of Officer Suter and others at the scene.  Davis verbally provoked and repeatedly shoved a police officer.  By all accounts he was behaving erratically and aggressively.  Officer Suter observed that the other people at the scene appeared to be afraid of Davis.  (Pl. Exs. 23.1, 32 at pp. 44, 66)  Officer Suter also saw that Davis' eyes were bloodshot and watery and that he had a "very strong odor of an alcoholic beverage on his breath."[34]

---

[33]   We note that Third Circuit precedent on the standard for qualified immunity is somewhat confusing.  Many cases have stated that an individual government official is entitled to qualified immunity if the right alleged to have been violated was "not clearly established."  *See, e.g., McKee v. Hart,* 436 F.3d 165, 172 (3d Cir. 2006).  In the Fourth Amendment search and seizure context, however, the law regarding warrantless searches and seizures is so well-developed and firmly rooted in decades' worth of Supreme Court precedent, it would be difficult to ever conclude that an officer who made an unexcused warrantless search or seizure did not violate clearly established law.  Thus, the language "clearly established right," when applied in this type of case, risks the undesirable and incongruous result that qualified immunity will be denied to most, if not all, law enforcement officers because the standard, so articulated, does not explicitly accommodate mistaken judgments made in the heat of the moment.  Therefore we agree with the Third Circuit's pronouncement of the qualified immunity standard in *Gilles* and *Sharrar*, because it clearly articulates when officers may be entitled to immunity from trial on Fourth Amendment violations committed in the field.  To be clear, we do not interpret *Gilles* and *Sharrar* as establishing a new or alternate standard for qualified immunity specific to Fourth Amendment cases.  Rather, we believe that *Gilles* and *Sharrar* more specifically articulate when qualified immunity shields police officers from suit on Fourth Amendment violations, explicitly recognizing that the "clearly established inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *McKee*, 436 F.3d at 171 (quoting *Brosseau v. Haugen*, 543 U.S. 194 (2004)).

[34]   While Plaintiffs dispute whether Davis was intoxicated, the evidence demonstrates that Officer Suter smelled alcohol on Davis' breath and Davis admitted to having consumed some alcohol that night.  (See Gloucester Ex. E at

(Pls. Ex. 23.1)  Testifying about the moments just before he

entered the house at 19 West Washington Street, Officer Suter

explained:

> At that point-- you're talking about things are
> happening in seconds and minutes-- it's still not
> clear if I have a new incident with domestic
> violence.  He had just shoved me.  He's acting
> violent.  He's injured.  He's under the influence.
> And my concern was for him and for everybody-- I
> wasn't going to let him into the house and become a
> barricaded subject. . . . Once we get the ambulance
> there and get him to the hospital and then do damage
> control, who injured him, you know was there
> domestic violence, did he cause damage, I could have
> charged him with disorderly conduct or whatever
> later.  That was where I was with the situation at
> the time.

(Pls. Ex. 32; p. 50-51)  Moreover, nothing in the record

establishes that Officer Suter knew that Davis lived at 19 West

Washington Street.[35]  Indeed, Officer Suter knew that Davis had

attempted to gain entry into a house that was not his earlier

that night.  Thus, we do not believe the situation, as perceived

by Officer Suter at the time, was so clear that a reasonable

officer would conclude that exigent circumstances did not exist.

Accordingly, Officer Suter is entitled to qualified immunity and

summary judgment is warranted on this alternative ground.

　　We come to the same conclusions with respect to the other

two officers. Officer Ranton personally observed Davis shove

---

000063; Pls. Ex. 20 at p. 122)  Plaintiffs also apparently concede that others
at the scene were intoxicated.  (See Pls. Br. at 22)

[35]  As noted previously, there is some evidence in the record that Davis
did not live at 19 West Washington Street.

Officer Suter and try to shut the door on Officer Suter.  (Pls. Ex. 23.3)  Thus, Officer Ranton had probable cause to believe that Davis had committed an offense.  Further, Officer Ranton observed Officer Suter enter the house after Davis, who was yelling and acting violently.  Based on these facts, there was a risk to Officer Suter's safety, the lone police officer entering the house with "several people following" in an unstable situation.  (Pls. Ex. 23.3)  Thus, exigent circumstances excused Officer Ranton's warrantless entry into the house and no constitutional violation occurred.

Similarly, when Officer Kappre arrived at 19 West Washington Street, he knew that Officer Suter was supposed to be there because Officer Suter had radioed where he was headed. (Pls. Ex. 23.0)  But when Officer Kappre arrived shortly after, he only heard "screaming" coming from inside the house.[36]  (Id.)  These facts were sufficient to give rise to probable cause that a crime was being committed and a belief that Officer Suter's safety was in danger, thus excusing the warrantless entry.  Accordingly, we hold that Officer Kappre committed no constitutional violation.

Alternatively, for the reasons explained above with respect to Officer Suter, we also hold that Officer Ranton and Officer Kappre are entitled to qualified immunity.  Given the volatile situation at 19 West Washington Street and the officers' knowledge of the prior events of the night, we hold that it would

---

[36] We may also infer that he saw Officer Suter's patrol car parked outside.

not be clear to a reasonable officer that exigent circumstances justifying their warrantless entry did not exist.

Excessive force

Plaintiffs allege that Officers Suter, Ranton, and Kappre used excessive force while arresting Davis in violation of his Fourth Amendment rights.  Specifically, Plaintiffs contend that Officer Suter punched Davis in the face, slammed him against the walls of his house, and sprayed him with pepper spray at close range.  They further assert that Officers Suter and Ranton pushed Davis' head into the kitchen floor.[37]

First we must observe that at least five people, including Davis' girlfriend, Lashana Carlson, witnessed the entire incident at 19 West Washington Street, yet deposition testimony or affidavits from these witnesses are strikingly absent from the record.[38]  The only testimony in the record regarding the events

---

[37] Plaintiffs make no specific factual allegations about Officer Kappre's involvement in the use of force.

[38] We note that the investigation reports of the Gloucester County Prosecutor contain hearsay statements by some of the people present at 19 West Washington Street.  Particularly, reports prepared by Gloucester County Detective Donovan state that Lashana Carlson and Rhonda Turner told him that the Paulsboro Officers punched Davis. (See Pls. Ex. 24)  This evidence, however, is inadmissible double hearsay.  Although Detective Donovan's report would likely be admissible at trial as a business record, see Fed. R. Evid. 803(6), the statements of Carlson and Turner do not fall within any exception. *See* Fed. R. Evid. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule.")  Thus, we do not consider these statements. *Blackburn v. United Parcel Service*, 179 F.3d 81, 95 (3d Cir. 1999)(noting that hearsay statements that are inadmissible at trial should not be considered when determining whether Plaintiff has established a triable issue of fact); *Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc.*, 826 F.2d 1335, 1339 (3d Cir. 1987) ("Summary judgment, of course, looks only to admissible evidence.").

at 19 West Washington Street comes from the police officers.[39]
To the extent that Plaintiffs have failed to put forth any
admissible evidence from which this Court might at least infer
that the alleged misdeeds actually occurred, their bald
assertions will not withstand summary judgment.  *See Versarge v.
Twp. of Clinton*, 984 F.2d 1359, 1370 (3d Cir. 1993)
("unsubstantiated arguments made in briefs or at oral argument
are not evidence to be considered"); *Jersey Cent. Power & Light
Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir.
1985)("[L]egal conclusions, unsupported by documentation of
specific facts, are insufficient to create issues of material
fact that would preclude summary judgment.").

Turning to the facts in the record, it is undisputed that
Officer Suter sprayed Davis once in the face with pepper spray.
Plaintiffs assert that given the situation, the use of pepper
spray was an excessive use of force.  They also argue that
failing to wash out the pepper spray until reaching headquarters
constituted excessive force.

An objective reasonableness test applies to Fourth Amendment
excessive force claims.  This test "requires careful attention to
the facts and circumstances of each particular case, including
the severity of the crime at issue, whether the suspect poses an
immediate threat to the safety of the officers or others, and

---

[39]   Davis was deposed in April, 2004, but testified that he had no
memory of any of the events of August 13, 2000.  (Pls. Ex. 36 at pp. 37-42)

whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The "reasonableness" of a particular use of force must be determined from the perspective of "a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," is constitutionally unreasonable. *Id.* (internal quotations omitted). "[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Applying this standard to the undisputed facts in the record, we must conclude that no Fourth Amendment violation occurred because the force used to arrest Davis was not unreasonable under the circumstances.  Davis was visibly agitated, acting aggressively and yelling profanities.  He banged the walls in his house and shoved Officer Suter three times before Officer Suter used one spray of pepper spray on Davis. Before resorting to the pepper spray, Officer Suter told Davis to relax or if he did not, he would be arrested.  (Pls. Ex. 32 at p. 53)  Davis responded by swinging his arms and yelling "I aint [sic] going nowhere.  Get the fuck off me."  Moreover, Plaintiffs

do not allege nor do we find any facts in the record establishing that Davis suffered any lasting injury from the spray.  Given these circumstances, we conclude that Davis posed an immediate threat to Officer Suter and possibly others in the house, therefore spraying Davis once with pepper spray was objectively reasonable.  *See Tofano v. Reidel*, 61 F. Supp. 2d 289, 301 (D.N.J. 1999)(officers' attempts to subdue arrestee with pepper spray were reasonable when arrestee was actively resisting arrest); *Mitchell v. Yeadon Borough*, No. 01-1203, 2002 U.S. Dist. LEXIS 3041 at *15 (E.D. Pa. Feb. 22, 2002) (use of pepper spray was reasonable when arrestee was "yelling and screaming and cursing" and snatched his arm away from the arresting officer); *Modugno v. Pa. State Police*, No. 00-3312, 2001 U.S. Dist. LEXIS 18148 at *15-16 (E.D. Pa. Nov. 6, 2001) (use of mace was reasonable when arrestee was "sprayed only after he repeatedly refused to comply with [the officer's] verbal and physical attempts to get him to cooperate").

Likewise we conclude that waiting to wash out Davis' eyes until reaching police headquarters was reasonable under the circumstances.  The record indicates that Davis continued to physically resist the officers and persisted yelling and cursing after Officer Suter sprayed him.  Given Davis' continuing lack of cooperation, the officers were not unreasonable to wait until Davis was in a more stable environment back at headquarters, where he could wash out his own eyes.  Indeed, once at

headquarters, Davis was placed in a holding cell with a water fountain where he flushed his face.  Thus we find no Fourth Amendment violation.  *See Mitchell*, 2002 U.S. Dist. LEXIS 3041 at *12 (use of pepper spray was reasonable when "Plaintiff was treated immediately upon his return to the police station").

We further conclude that Officer Suter's and Ranton's other actions, namely, sitting on Davis while he was face down on the kitchen floor, were reasonable.  The undisputed facts demonstrate it took three officers to get both of Davis' hands cuffed because Davis was actively resisting arrest-- squirming on the floor, putting his hands under his body, and kicking.  The officers only sat on Davis long enough to get the handcuffs on him.  (Pls. Ex. 32 at p. 58)  There is no evidence in the record that Davis had trouble breathing while laying on the floor.  The fact that "he was screaming and yelling the entire time trying to get up" indicates that Davis had little trouble breathing.  (Pls. Ex. 23.1)

Finally we address Plaintiffs' argument that Officer Ranton's "cancellation" of the ambulance which was en route to 19 West Washington Street violated Davis' Fourth Amendment rights. While this claim appears to be a variation of Plaintiffs' delay of medical treatment claims, Officer Ranton's actions took place during Davis' arrest, thus, we apply the Fourth Amendment's reasonableness standard rather than the Fourteenth Amendment

deliberate indifference standard applied to pretrial detainees.[40]

Officer Ranton decided to reroute the ambulance to police headquarters, rather than the house, just after Davis was placed in handcuffs. (Pls. Ex. 23.3)  Further, the evidence in the record establishes that the ambulance should have already arrived by the time Davis was arrested.  (Pls. Ex. 32 at p. 62-63) Officer Ranton was faced with the choice of waiting for a late ambulance at the house with Davis handcuffed, sitting on the kitchen floor, or returning to police headquarters where the ambulance could meet them.  Moreover, the record indicates that only a short amount of time passed between the decision to reroute the ambulance and the ambulance's pick-up of Davis at headquarters.  Thus, whatever delay that may have resulted from Officer Ranton's decision was minimal at best.  Accordingly, we hold the decision to meet the ambulance at police headquarters was objectively reasonable under the circumstances and Davis' Fourth Amendment rights were not violated.

Next we turn to Plaintiffs' excessive force claims against Officers Marino and Davis.  Plaintiffs assert that these officers used excessive force while removing Davis from the Paulsboro police headquarters' holding cell during his transfer over to the

---

[40]   *See James v. York County Police Dep't*, No. 05-2852, 2005 U.S. App. LEXIS 26876 at *9 & *10 n.3 (3d Cir. Dec. 8, 2005) ("The Due Process Clause of the Fourteenth Amendment protects pretrial detainees, those charged with, but not yet convicted of, a crime. . . . the generalized notion of 'substantive due process' under the Fourteenth Amendment, was not the guide for analyzing [plaintiff's excessive force] claim because [plaintiff] could seek relief under a more explicit textual source of protection, the Fourth Amendment.") (internal citations omitted).

Gloucester County Sheriff.  Because Davis had not been formally charged at this point we will analyze this claim under the same Fourth Amendment standard applied to his other excessive force claims.  *Hill v. Algor*, 85 F. Supp. 2d 391, 403 (D.N.J. 2000) ("This Court agrees with the Ninth and Tenth Circuits that a person continues to be an arrestee subject to Fourth Amendment protection through the period of post-arrest but pre-arraignment detention.").

The force used to remove Davis from his cell was minimal. Officer Marino nudged Davis several times on the lower leg in an attempt to rouse Davis, who was totally unresponsive.  When Davis made no response to the officers present, Officer Marino alone stepped into the cell and grabbed Davis by the left arm.  He smoothly pulled Davis by the arm off the bench and onto his hands and knees on the floor.  As Davis continued to be nonresponsive, Officer Marino, still holding Davis' left arm, pulled him a few feet across the floor and out of the cell.  He then placed handcuffs on Davis, whereupon Davis, with assistance, stood up and walked down the hall.  We hold that no Fourth Amendment violation occurred as Officer Marino's actions were reasonable under the circumstances.

Summary judgment will also be granted as to Officer Davis' alleged use of excessive force.  Based on the facts in the record, it is difficult to identify what specific conduct of Officer Davis Plaintiffs complain about.  Officer Davis did not

participate in the physical removal of Davis from the holding
cell.  The only evidence in the record regarding Officer Davis'
involvement demonstrates that Officer Davis assisted Officer
Marino in placing handcuffs on Davis.[41]  On these facts we find
no basis for an excessive force claim against Officer Davis.


Delay of medical treatment

    Plaintiffs' medical treatment claims are governed by the Due
Process Clause of the Fourteenth Amendment.  *Natale v. Camden
County Correctional Facility*, 318 F.3d 575, 581 (3d Cir. 2003).
We must determine whether there was "evidence of a serious
medical need and acts or omissions by prison officials indicating
deliberate indifference to those needs."  *Id.* at 582.  Deliberate
indifference includes "knowing of and disregarding an excessive
risk to inmate health or safety," *Farmer v. Brennan*, 511 U.S.
825, 837 (1994), or "necessary medical treatment [being] delayed
for non-medical reasons," *Monmouth County Corr. Inst. Inmates v.
Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).  Applying this
standard, we conclude that the Defendants were not deliberately
indifferent to Davis' medical needs.

    First, with regard to the Paulsboro Defendants, other than
the decision to reroute the ambulance discussed above, there is
no evidence that any Paulsboro officer delayed Davis' medical

---

[41]  Based on the videotape of the removal, Officer Davis is apparently
the officer who handed Officer Marino handcuffs as Officer Marino stood over
Davis. (Pls. Ex. 30)

39

treatment.  The record indicates that within minutes of arriving
at police headquarters after his arrest, the ambulance arrived to
transport Davis to UMH.  (Pls. Ex. 23.1)  Dr. Arriviello examined
Davis and determined that Davis was fit for incarceration.  Once
back at Paulsboro police headquarters, Davis was periodically
checked.  While there is evidence that Davis vomited and was
still bleeding, we cannot conclude that any of the Paulsboro
officers were deliberately indifferent to an obvious medical need
because only a few hours earlier an emergency room doctor had
declared Davis fit for incarceration and sent Davis away with
instructions to take Advil and apply ice.  Under these
circumstances the Paulsboro Defendants are not expected to
second-guess an emergency room physician's determination about
Davis' medical condition.

     Similarly, none of the Gloucester Officers were deliberately
indifferent to Davis' medical needs.  Officer Reichert received
Davis' fit for incarceration slip.  Davis was conscious and able
to walk with assistance when he was placed in Officer Reichert's
patrol car.  Upon observing Davis at booking, the decision was
made to call a medic.  Sergeant DeMarzio testified, "I asked
[Davis] his name and he didn't respond.  There was just no
response out of him.  I told [the officers] to take him in
holding two, lay him on a mat.  You know, I didn't know whether
he was drunk or what was wrong with him."  (Gloucester Ex. V at
p. 22).  Sergeant DeMarzio ordered an officer to stay with Davis

40

until the medic arrived.   (Id. at 47)

At most, Davis' medical treatment was delayed approximately 35 minutes while waiting for Medic Walker.[42]  Given that Davis arrived with a fit for incarceration slip, and that none of Davis' observable symptoms clearly indicated that he needed immediate medical attention, we cannot hold that the mere passage of 35 minutes while awaiting Medic Walker amounts to deliberate indifference to Davis' medical needs.  Accordingly, summary judgment will be granted.

To summarize, with respect to Plaintiffs' claims against the individual law enforcement officer defendants, we hold that Plaintiffs have failed to establish that any constitutional injuries occurred.  We further hold alternatively that Officers Suter, Ranton and Kappre are entitled to qualified immunity from suit based on the warrantless entry into Davis' home.

Accordingly, we will grant summary judgment on all of the claims against the law enforcement officers.


C.

Plaintiffs also broadly assert that Defendants Borough of Paulsboro, County of Gloucester, Paulsboro Police Department, Gloucester County Sheriff Department, Paulsboro Police Chief Ridinger and Gloucester County Sheriff Gill are liable under

---

[42]  Medic Walker was on duty giving out medications in the "female center" of the Gloucester County Jail when he was summoned to attend to Davis. (Gloucester Ex. V at p. 32-33)

theories of: respondeat superior, failure to train / supervise, and formally adopted policies and customs which resulted in the violation Davis' constitutional rights.

Municipalities may be liable for constitutional torts if two prerequisites are met: (1) the plaintiff's injury was caused by a constitutional deprivation; and (2) the municipal entity is responsible for that violation. *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992).  A government entity may not be held vicariously liable for the constitutional violations of its agents under a theory of respondeat superior. *Id.* at 122. Rather, municipal entities are only liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible for under § 1983."[43] *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978).

For the reasons stated above, we have held that no constitutional violations have occurred in this case.  When there is no underlying constitutional violation, there can be no local governmental or individual supervisory liability. *City of Los Angeles v. Heller*, 475 U.S. 796 (1986); *Grazier v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003); *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1154 (3d Cir. 1995).

---

[43]  Alternatively we dismiss the claims asserted against Defendants Borough of Paulsboro, the Paulsboro Police, and Paulsboro Police Chief Ridinger under a respondeat superior theory because Plaintiffs have informed the Court that they do not wish to pursue these claims.

Accordingly, summary judgment will be granted on all § 1983 claims asserted against the local governmental and supervisory defendants.

### IV.

For the reasons set forth above, with respect to the federal claims, the Court will grant the summary judgment motions of (1) Paulsboro Police Officers Suter, Ranton, Kappre, Davis and Marino; (2) County of Gloucester, Gloucester County Sheriff Gill, Gloucester County Sheriff Officers Crank, DeMarzio, Galloway, and Hatton; and (3) Borough of Paulsboro, Borough of Paulsboro Police Department, and Paulsboro Police Chief Ridinger.  We decline to exercise supplemental jurisdiction over the remaining state law claims.  *See* 28 U.S.C. § 1367(c)(3); *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 444 (3d Cir. 1997) (the decision to decline to exercise supplemental jurisdiction over a plaintiffs' remaining state law claims "is committed to the sound discretion of the district court").  The Court will issue an appropriate order.

Date: March  27th , 2006

s/Joseph E. Irenas
JOSEPH E. IRENAS, S.U.S.D.J.

43