UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

SARAH DAVIS,                    :      HONORABLE JOSEPH E. IRENAS
ADMINISTRATRIX, AD             :
PROSEQUENDUM, et al.,          :         NO. 02-CV-3659 (JEI)
                               :
        Plaintiffs,            :           **OPINION**
                               :      **(Docket Nos. 204 & 210)**
v.                             :
                               :
TOWNSHIP OF PAULSBORO, et      :
al.,                           :
        Defendants.            :

**APPEARANCES:**

MARSHALL L. WILLIAMS
By: Marshall L. Williams, Esq.
1201 Sansom Street
3rd Floor
Philadelphia, PA 19107
        Attorney for Plaintiffs

ROTOLO & MIDLIGE
By: E. Carr Cornog, III, Esq.
2200 Route 31, Suite 12
Lebanon, NJ 08333
        Attorney for Gloucester County Defendants

POWELL, BIRCHMEIER & POWELL
By: James R. Birchmeier, Esq.
1891 State Highway 50
P.O. Box 582
Tuckahoe, NJ 08250-0582
        Attorney for Borough of Paulsboro Defendants

PARKER, MCCAY & CRISCUOLO, P.A.
By: Lisa B. Baughman, Esq.
Three Greentree Centre, Suite 401
Route 73 & Greentree Road
P.O. Box 974
Marlton, NJ 08053
        Attorney for Defendant Underwood Memorial Hospital

BLUMBERG & LINDNER, LLC
By: Charles B. Austermuhl
158 Delaware Street

1

P.O. Box 68
Woodbury, NJ 08096
          Attorney for Defendants Dr. Arriviello and Emergency
          Physicians Services, LLC


**IRENAS**, Senior District Judge:

     This case arises out of an altercation outside a nightclub, in which Ernest Davis was struck in the head with a bottle, and the events that followed.  Five summary judgment motions were filed by various groups of Defendants.  In a separate opinion we addressed the summary judgment motions of the law enforcement Defendants.[1]  This opinion addresses the summary judgment motions of Defendants Dr. Richard Arriviello, Jr., D.O. ("Dr. Arriviello"), Emergency Physicians Services, LLC ("EPS"), and Underwood Memorial Hospital ("UMH") (collectively the "medical defendants").[2]

     In their twelve count, 61 page, Fourth Amended Complaint, Plaintiffs assert against the medical defendants: federal claims pursuant to the Emergency Medical Treatment and Active Labor Act,

---

[1]  As to the Motions for Summary Judgment of Defendants (1) Paulsboro Police Officers Suter, Ranton, Kappre, Davis and Marino; (2) County of Gloucester, Gloucester County Sheriff Gill, Gloucester County Sheriff Officers Crank, DeMarzio, Galloway, and Hatton; and (3) Borough of Paulsboro, Borough of Paulsboro Police Department, and Paulsboro Police Chief Ridinger, in a companion opinion and order issued today, we grant summary judgment on all claims arising under federal law and dismiss the remaining supplemental state law claims.

[2]  EPS provides UMH with "professional emergency services."  Pursuant to an "Independent Contractor's Agreement" EPS "engage[d] Dr. Arriviello on an independent contracting basis to perform professional emergency physician services in connection with the operation of [UMH] and its Emergency Department under and in accordance with certain agreements between EPS and [UMH]."  (Pls. Ex. 15)

42 U.S.C. § 1395dd ("EMTALA") and the "Consolidated Omnibus Budget Reconciliation Act;"[3] and state law claims for lack of informed consent, negligent misrepresentation, wrongful death, and a survivorship claim.[4]  Plaintiffs also assert a professional negligence claim against Dr. Arriviello only and assert a "vicarious and corporate liability" claim against EPS and UMH.[5]

For the reasons explained below, we will grant summary judgment to the medical defendants on the federal claims and

---

[3]  Plaintiffs do not identify which "Consolidated Omnibus Budget Reconciliation Act" they mean to bring their claim under.  We note that EMTALA was enacted by Congress as part of the Consolidated Omnibus Budget Reconciliation Act of 1986 and that Plaintiffs' factual allegations with respect to the EMTALA and "COBRA" claims in the Fourth Amended Complaint are essentially identical, including the same misspellings and incorrect punctuation. (Compare Fourth Am. Compl. ¶¶ 213-23 with ¶¶ 225-35) Thus, we question whether Plaintiffs actually assert two different causes of action under two different federal statutes or whether Plaintiffs have only asserted an EMTALA claim under two different names.  In any event, we need not dwell on the question as Plaintiffs have advised that they no longer wish to pursue their "COBRA" claim.

[4]  The Fourth Amended Complaint apparently asserts claims under 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988 against the medical defendants.  While the course of proceedings in this case leads the Court to believe these claims are primarily aimed at the law enforcement defendants, to the extent Plaintiffs intend to assert these claims against the medical defendants, summary judgment is warranted for a number of reasons.  First, as more fully explained in our companion opinion in this case, the record is completely devoid of any evidence of racial discrimination by any defendant, including the medical defendants.  Thus, the §§ 1981, 1985 and 1986 claims will be dismissed.  Second, none of the medical defendants are state actors.  *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982); *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *see also Carver v. Plyer,* 115 Fed. Appx. 532, 536 (3d Cir. 2004) (hospital and its medical staff are not state actors); *Long v. Admin. of Montgomery Hosp.*, No. 00-cv-1056, 2000 U.S. Dist. LEXIS 15506 at *6-7 (E.D. Pa. Oct. 25, 2000) ("I reject plaintiff's contention that the alleged Medicare contract between the defendant and the government, without more, renders the hospital a state actor."), *aff'd without opinion*, 275 F.3d 36 (3d Cir. 2001).  Moreover, there is no evidence in the record that any of the medical defendants conspired with state actors.  *See Carver,* 115 Fed. Appx. at 537.  Thus, summary judgment is warranted on the §§ 1983 and 1988 claims.  Alternatively, we dismiss Plaintiffs' § 1986 claims against the medical defendants because Plaintiffs have advised that they no longer wish to pursue that claim.

[5]  We have subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

dismiss the remaining state law claims.

## I.

In the early morning hours of August 13, 2000, Ernest Davis was hit in the head with a glass bottle outside the 1048 Club, a nightclub in Paulsboro.  Paulsboro police officers were called to investigate the incident.  With the help of friends, Davis was placed in a car and left the nightclub.[6]

In the course of their investigation, Paulsboro police officers found Davis at 19 West Washington Street in Paulsboro, New Jersey.  (Pls. Ex. 32 at pp. 36-37) Paulsboro Police Officer Suter, the first to arrive at the scene, observed Davis standing in the doorway of the house with blood on his shirt, "yelling and screaming" at the women who were there, one of whom was Davis' girlfriend, Lashana Carlson.  (Pls. Ex. 23.1)  Officer Suter immediately exited his car, at which point Davis walked out to the curb directly towards Officer Suter, pushing past the women. (Pls. Exs. 23.1 and 32 at p. 44)

Officer Suter could see that Davis was still bleeding from his head and right ear, and asked Davis what had happened and if he needed an ambulance.  (Pls. Exs. 23.1 and 32 at p. 45)  Davis responded "antagonistically," yelling that "nothing was going on" and Officer Suter should mind his own business.  (Pls. Ex. 23.1

---

[6]  A more detailed discussion of the facts relevant to the claims involving the law enforcement defendants may be found in the Court's companion summary judgment.

and 32 at p. 49)  Officer Suter continued his attempts to investigate how Davis had been injured and what the current disturbance was about, but Davis refused to cooperate.  (Id.)

The confrontation escalated from that point, culminating in Davis' arrest.  Because Davis was uncooperative and resisting arrest, Officer Suter sprayed Davis once with pepper spray and then wrestled Davis to the ground.  It took three police officers to sufficiently subdue and handcuff Davis, who was kicking and yelling.

Officer Suter transported Davis to police headquarters where they were met by Carlson and Paulsboro Police Officer Kappre. (Pls. Exs. 23.0 and 23.1)  The officers and Carlson anticipated that they would meet an ambulance at police headquarters.  (Id.) Davis was escorted to a holding cell while Carlson went to the lobby to wait for the ambulance.  (Id.)  Once in the holding cell, Davis flushed his face at the water fountain to relieve the effects of the pepper spray. (Pls. Ex. 23.1)  Davis stayed in the holding cell for approximately five minutes before the ambulance arrived.  (Id.)

Officers Suter and Kappre escorted Davis to the ambulance and placed him inside.  (Pls. Ex. 23.0 and 23.1)  Carlson was present but did not ride in the ambulance.  (Id.)  The ambulance records indicate that Davis was "very argumentative" and the ambulance personnel were unable to obtain vital signs or medical history from him.  (Pls. Ex. 3)  Officer Kappre rode in the

ambulance with Davis to UMH.

The ambulance arrived at the UMH Emergency Room at 3:06 a.m.
Dr. Arriviello examined Davis at approximately 3:30 a.m.  (Pls.
Ex. 4)  Dr. Arriviello was aware that Davis had been hit in the
head with a bottle, but Davis had not lost consciousness.[7]  (Pls.
Exs. 4 and 20 at p. 49)  Dr. Arriviello's verbal questioning of
Davis indicated that Davis was properly oriented to time, place,
and person.  (Pls. Ex. 20 at p. 67)  He visually observed Davis
for any obvious wounds or other evidence of injury, including
looking for asymmetrical facial or eye movements which could
indicate neurological problems.  (Id. at p. 57)  Dr. Arriviello
also checked Davis' reflexes, percussed his spine and neck for
tenderness, and observed that Davis had full range of motion when
moving his neck.  (Id. at p. 59-66)  No tests, such as an x-ray
or CAT scan, were conducted.  Dr. Arriviello concluded that Davis
had "no obvious neurological deficits by just looking and talking
with the patient."  (Id. at p. 66)

Dr. Arriviello diagnosed Davis with a ruptured right eardrum
and a scalp abrasion.  (Pls. Ex. 4)  Based on this diagnosis, Dr.
Arriviello determined that Davis was "fit for incarceration"[8] and

---

[7]  Plaintiffs assert that Davis did lose consciousness before arriving
at UMH, however they point to no evidence in the record to support their
contention.  Moreover, the undisputed evidence shows that the information
available to Dr. Arriviello, which he had no reason to doubt, indicated that
Davis had not lost consciousness before arriving at UMH.

[8]  Dr. Arriviello testified that "fit for incarceration" means
"medically cleared" and "safe to go to jail."  (Pls. Ex. 20 at p. 95-96)

6

discharged Davis into police custody. (Pls. Ex. 5)  The standard discharge instruction form given to the police and Davis directed Davis to take 600 milligrams of Advil every 6 hours and apply an ice pack to "the affected area" every 2-3 hours for the next 48 hours.  (Pls. Ex. 5)  Although the form contained check-boxes for head injury instructions, none of those specific instructions were marked on Davis' discharge instruction sheet.[9] (Id.)

Officer Ranton picked up Davis and Officer Kappre at UMH to transport them back to Paulsboro police headquarters.  Davis was placed in a holding cell at 4:08 a.m. (Pls. Ex. 6)  Officer Kappre observed that Davis appeared to fall asleep immediately. (Pls. Ex. 23.0)  The Paulsboro Police Cell Block Prisoner Log indicates that officers checked on Davis at 5:50 a.m. and 6:20 a.m. (Pls. Ex. 6)  Both times Davis appeared to be sleeping. (Id.)  Officer Kappre at one time observed Davis vomiting on the cell floor.  (Pls. Ex. 23.0)  When Officer Kappre told Davis he should vomit in the toilet Davis responded "O.K."  (Id.)

Because Davis could not post bail, he was transferred to the Gloucester County Sheriff's Department for holding in the county jail.  Accordingly, at approximately 7:12 a.m.[10] Gloucester

---

[9]  Dr. Arriviello testified that he gave verbal head injury instructions to Officer Kappre and Lashanna Carlson.  Because the discharge instructions did not document the verbal instructions, for purposes of this motion, we draw the inference in Plaintiffs' favor that head injury instructions were not given.

[10]  We note that all of the other documents submitted in connection with the present motions indicate that the Gloucester County Sheriff's Officers picked-up and transported Davis at approximately 6:55 a.m. (See Pls. Exs. 6, 17.1, 17.2, 23.2) However, Officer Reichert's report indicates that the time

County Sheriff's Officer Kimberly Reichert arrived at Paulsboro Police headquarters to transport Davis to the county jail.  (Pls. Ex. 17.0)  Davis was conscious when he entered Officer Reichert's patrol car.  (Pls. Ex. 37 at p. 47)

The trip to the Gloucester County jail lasted approximately ten minutes. (Pls. Ex. 17.0)  Davis was assisted into the booking area where Officer Reichert gave the booking officers Davis' fit for incarceration slip.  (Id.)  Davis was booked at approximately 7:40 a.m. (Pls. Ex. 17.3)

Upon Davis' arrival at the Gloucester County Jail, Sergeant Robert DeMarzio observed, "Davis look [sic] intoxicated[11] and he was snoring upon arrival and had to be carried in by assisting officers."  (Gloucester Ex. W)  Because of Davis' condition, he was placed in a holding cell and Medic Walker was called to attend to him.  (Id., see also Gloucester Ex. V at p. 33-36)  The parties do not dispute that Medic Walker[12] found Davis face down on the cell floor with blood "oozing" from his right ear, nose and scalp and that Davis was unresponsive to Walker's various attempts to rouse Davis.  (Pls. Ex. 17.4)  Medic Walker advised Lieutenant William Crank to call an ambulance.  (Pls. Ex. 17.3,

---

was 7:12 a.m. (Pls. Ex. 17.0)  Since this is the time Plaintiffs assert is correct, for the purposes of this motion we will assume 7:12 a.m. is accurate.

[11]  Sergeant DeMarzio testified that Davis "smelled of alcohol" and did not respond to questions.  (Gloucester Ex. V at p. 18, 22) Defendant Officers Hatton and Galloway also testified that they smelled alcohol on Davis. (Gloucester Exs. T at p. 51; U at p. 74)

[12]  Medic Walker was named a defendant to the Third Amended Complaint, but he was dropped as a defendant to the Fourth Amended Complaint.

17.4)  The entries in the Gloucester County Sheriff's

Lieutenant's Log Book recount the timing of these events:

> 7:40 [a.m.] (2) Booked inmate Ernest C. Davis.  He
> had medical clearance from Paulsboro P.D. and U.M.H.
>
> 8:15 [a.m.] (3) Had Medic Jim Walker check above
> inmate and read medical clearance sheet.
>
> 8:30 [a.m.] (4) Medic Walker asked me to call a
> [sic] ambulance and R/P to transport inmate Davis to
> U.M.H.
>
> 8:43 [a.m.] (5) Ambulance and R/P arrived at
> [Gloucester County Jail]
>
> 9:00 [a.m.] (6) Informed by EMT's [sic] that they
> are transporting the above inmate to Cooper Hospital
> in Camden

(Pls. Ex. 17.3)

After being admitted to Cooper Hospital, Davis underwent

several surgeries, including brain surgery for a subdural

hematoma and a subarachnoid hemorrhage.  He spent several months

at Cooper Hospital, including over two months in intensive care.

On November 21, 2000, Davis was transferred out of Cooper

Hospital into rehabilitative care.

Davis died on October 15, 2004.  His death certificate lists

the causes of death as "acute myelogenous leukemia," "ureteral

obstruction- bilateral," and "acute renal failure."  (Pls. Ex. 9)

Plaintiffs, the parents of Ernest Davis, bring this suit on

their son's behalf.

**II.**

9

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  "'With respect to an issue on which the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.

Plaintiffs bring their EMTALA claim against Dr. Arriviello, EPS, and UMH.  However, EMTALA only creates a private right of action against hospitals, not individual physicians and not

private corporations, such as EPS, that are not hospitals and do
not participate in Medicare.  *See* 42 U.S.C. § 1395dd(d)(2)(A);
*Delaney v. Cade*, 986 F.2d 387, 393-94 (10th Cir. 1993)(no private
right of action against individual physicians); *Baber v. Hosp.
Corp. of Am.*, 977 F.2d 872, 877 (4th Cir. 1992)(same); and
*Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1260 (9th Cir. 2001)(no
private right of action against non-hospital private
corporation);  *Medero Diaz v. Grupo de Empresas de Salud*, 112 F.
Supp. 2d 222, 225 (D.P.R. 2000)(same).  Therefore Plaintiffs'
EMTALA claims against EPS and Dr. Arriviello fail as a matter of
law.

     With respect to UMH, Plaintiffs assert it violated EMTALA
because Dr. Arriviello failed to detect Davis' brain hemorrhage.
In support of their argument Plaintiffs submit the expert medical
opinion of Dr. Paul Kolecki.[13]  Based on his review of Davis'
medical records, Dr. Kolecki opines that:

> In my medical opinion, the care rendered to Mr.
> Davis in the Underwood [Memorial Hospital Emergency
> Department] was inadequate.  In the [emergency
> department] Mr. Davis was noted to have a head
> injury and a perforated, bleeding tympanic
> membrane.[14]  Tympanic membrane perforations are
> frequently seen with high-energy traumatic exposures
> such as blast injuries and lightning strikes.  In my
> opinion, most Emergency Medicine physicians who
> treat a patient with a head injury and a bleeding,

_____

     [13]  Dr. Kolecki is board certified in emergency medicine and medical
toxicology. He is an Assistant Professor in the Department of Emergency
Medicine at Thomas Jefferson University Hospital.  (Pls. Ex. 7)

     [14]  The tympanic membrane, in lay terms, is the ear drum.

> perforated tympanic membrane would suspect that a
> potentially significant head injury occurred and
> would order a head CT scan to rule out intercranial
> pathology.  Thus, in my opinion, Mr. Davis should
> have received a head CT scan while being treated at
> [UMH].

(Pls. Ex. 7)  We hold this evidence insufficient to sustain an

EMTALA claim as a matter of law.

Plaintiffs assert that UMH breached their statutory duty to

"provide for an appropriate medical screening examination within

the capability of the hospital's emergency department, including

ancillary services routinely available to the emergency

department, to determine whether or not an emergency medical

condition exists."[15]  42 U.S.C. § 1359dd(a).  While the Third

Circuit has not interpreted the "appropriate medical screening"

requirement, many other circuits have explained, "EMTALA is not a

substitute for state law malpractice actions, and was not

intended to guarantee proper diagnosis or to provide a federal

remedy for misdiagnosis or medical negligence."  *Power v.

Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994).  Thus,

---

[15]  A hospital may also be liable under EMTALA for failing to stabilize
a patient with an emergency medical condition.  *See* 42 U.S.C. § 1395dd(b);
*Love v. Rancocas Hosp.*, No. 01-5456, 2005 U.S. Dist. LEXIS 12758 at *9 (D.N.J.
June 29, 2005) ("EMTALA provides two avenues for plaintiffs to make claims
under the statute: (1) a patient must receive 'appropriate medical screening'
and (2) a hospital may not discharge or transfer to another facility a patient
with an emergency medical condition without first stabilizing the patient's
condition.").  Plaintiffs do not assert a failure to stabilize claim,
presumably because their theory of liability is that UMH failed to detect
Davis' emergency medical condition.  *See generally Harry v. Marchant*, 291 F.3d
767, 768 (11th Cir. 2002) ("Under EMTALA, when an individual presents for
treatment at the emergency department of a hospital, the hospital must provide
an appropriate medical screening to determine whether an emergency medical
condition exists. If an emergency medical condition is determined to exist,
the hospital ordinarily must provide stabilization treatment before
transferring the patient.").

the "key requirement" of a hospital's duty under § 1359dd(a) "is that a hospital apply its standard of screening *uniformly* to all emergency room patients, regardless of whether they are insured or can pay.  The Act does not impose any duty on a hospital requiring that screening result in a correct diagnosis."  *Id.* (emphasis in original; internal citations omitted).[16]

Summary judgment is warranted on Plaintiffs' EMTALA claim because they have not put forth any evidence that UMH treated Davis differently than any other patient who came to the

---

[16]     *See also Nolen v. Boca Raton Community Hosp.*, 373 F.3d 1151, 1155 (11th Cir. 2004) ("So long as the hospital gave to [Plaintiff] the same quality screening that it would have given a similarly situated [patient], there is no violation of the EMTALA."); *Hunt v. Lincoln Mem. Hosp.*, 317 F.3d 891, 894 (8th Cir. 2003)("The EMTALA is no a substitute for state-law medical malpractice actions.  It does not guarantee proper diagnosis or provide a federal remedy for medical negligence.  Rather, the EMTALA focuses on uniform treatment of patients in hospital emergency departments."); *Phillips v. Hillcrest Med. Center,* 244 F.3d 790, 797 (10th Cir. 2001) ("EMTALA's requirement of an 'appropriate screening examination' undeniably requires [a hospital] to apply uniform screening procedures to all individuals coming to the emergency room. . . . a hospital's obligation under EMTALA is measured by whether it treats every patient perceived to have the same medical condition in the same manner."); *Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1256 (9th Cir. 2001) ("We hold that a hospital satisfies EMTALA's 'appropriate medical screening' requirement if it provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury."); *Battle v. Memorial Hosp.*, 228 F.3d 544, 557 (5th Cir. 2000) ("A hospital's liability under EMTALA is not based on whether the physician misdiagnosed the medical condition or failed to adhere to the appropriate standard of care. Instead, the plaintiff must show that the hospital treated him differently from other patients with similar symptoms."); *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192-93 (1st Cir. 1995) ("EMTALA does not create a cause of action for medical malpractice.  Therefore . . . faulty screening, in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute."); *Gatewood v. Wash. Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C. Cir. 1991) ("[A] hospital fulfills the 'appropriate medical screening' requirement when it conforms in its treatment of a particular patient to its standard screening procedures."); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 272 (6th Cir. 1990) ("If [the hospital] acts in the same manner as it would have for the usual paying patient, then the screening provided is 'appropriate' within the meaning of the statute.").

emergency department with similar injuries and symptoms.

The Fourth Circuit came to the same conclusion on very similar facts.  In *Baber*, the plaintiff brought suit on behalf of his deceased sister, asserting that the defendant hospital violated EMTALA by failing to conduct a CAT scan or x-ray on the woman after she suffered a seizure and hit her head.  977 F.2d at 881.  The emergency room doctor testified that he performed a medical screening for patients with head injuries and concluded that his patient's signs and symptoms did not warrant advanced tests such as a CAT scan or x-ray.  *Id.*  The woman subsequently died of intracerebrovascular rupture.  *Id.* at 876.

The Fourth Circuit held "[b]ecause Mr. Baber has offered no evidence of disparate treatment, we find that the district court did not err in granting summary judgment."  *Id.* at 881.  The Court continued:

> Mr. Baber attempts to demonstrate a genuine issue of material fact by presenting an affidavit from [a licensed physician] [stating] 'I am of the opinion that good medical care required the emergency room physician . . . to perform a neurological exam, obtain an x-ray and obtain a CT scan.'  While [the physician's] affidavit may create an issue with regard to whether [the emergency room doctor's] treatment of Ms. Baber deviated from accepted medical standards of care, it does not create a material question of fact as to whether [the emergency room physician] examined Ms. Baber differently from any other patient with a similar history, signs, and symptoms. . . . Absent such a showing, his affidavit did not address the essential issue of whether Ms. Baber received disparate treatment.

14

*Id.* at 881-82.  We find Plaintiffs' case indistinguishable.

Accordingly, summary judgment will be granted on Plaintiffs' EMTALA claim.

**IV.**

For the reasons stated above, we will grant summary judgment to the medical defendants on the EMTALA claim.  No other claims arising under federal law remain and we decline to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 444 (3d Cir. 1997) (the decision to decline to exercise supplemental jurisdiction over a plaintiffs' remaining state law claims "is committed to the sound discretion of the district court").  The Court will issue an appropriate order.


Date: March  27th , 2006

s/Joseph E. Irenas
_____
JOSEPH E. IRENAS, S.U.S.D.J.